SANTOS GABRIEL MATIAS GUERRA,

      Plaintiff,

      v.

MARCO TEIXEIRA, *d/b/a*
*Twicegood Drapery Experts*,

      Defendant.

Civil Action No. TDC-16-0618

## MEMORANDUM OPINION

Plaintiff Santos Gabriel Matias Guerra filed this federal and state wage law case against Defendant Marco Teixeira, alleging that Teixeira failed to pay him overtime wages, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19 (2012), the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3–401-31 (2016), and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3–501-09. Guerra also brought a claim under the Maryland Workplace Fraud Act ("MWFA"), Md. Code Ann., Lab. & Empl. §§ 3–901-20, alleging that Teixeira misclassified him as an independent contractor, and a claim under 26 U.S.C. § 7434, alleging that Teixeira unlawfully issued him an Internal Revenue Service ("IRS") Form 1099 ("1099"), reflecting payments to a contractor, rather than an IRS Form W-2 ("W-2"), reflecting payments to an employee. After granting summary judgment in favor of Teixeira on Guerra's claim under 26 U.S.C. § 7434, the Court conducted a three-day bench trial to determine liability and damages on all remaining claims. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and conclusions

of law. For the reasons set forth below, the Court finds that Teixeira is liable for violations of the FLSA, MWHL, MWPCL, and MWFA, and that Guerra is entitled to double damages.

<h1 style="text-align:center">FINDINGS OF FACT</h1>

At trial on December 10, 11, and 13, 2018, the following witnesses testified: Guerra; Teixeira; Jose Machado, an accountant who prepared a federal income tax return for Guerra; Sybil McFarland and Jay Marks, both owners of drapery manufacturing companies that contract with Teixeira's company, Twicegood Drapery Experts ("Twicegood"), for installation of their products; and Daniel Schaefer, the insurance agent who handles Twicegood's commercial policies. Based on the witness testimony, as well documentary exhibits offered by both parties, the Court finds the following facts.

Teixeira has operated Twicegood as a sole proprietorship since 2004. Teixeira contracts with drapery and window blinds manufacturers to install their products at commercial properties across the mid-Atlantic region. Teixeira and Guerra first met in the summer of 2011, when Guerra was outside of a 7-Eleven store seeking to be hired as a day laborer. Teixeira drove up to the store and announced that he needed one or two people for work installing drapery and blinds. Teixeira and Guerra exchanged phone numbers, and later that evening, Teixeira called Guerra and asked to meet him at Dunkin Donuts early the next morning. Guerra agreed, and the next morning he met with Teixeira and Teixeira's associate, Djalma Goncalves. At that meeting, Teixeira told Guerra that Goncalves would pay Guerra $100 or $110 for the first day's work and then $12 per hour if Guerra continued to work for him. No contract or paperwork was signed. Teixeira then sent Guerra to work that same day.

## I.     Work Terms and Conditions

From that day forward, Guerra went to Teixeira's house almost every morning to pick up materials and tools for the day's installation assignment and then drove to the job site.  During his first few months on the job, Guerra worked with Goncalves, who taught him how to perform the installation work, and Teixeira paid him $12 per hour as promised.  Because the work was not difficult to learn, after approximately five months Guerra started completing jobs without the guidance of Goncalves, frequently working with other installers hired by Teixeira.

Teixeira provided Guerra with a Twicegood email address, Gabriel@DraperyExperts.com, and notified Guerra about each job by sending an email to that address the night before the work was to be performed. The email included the job location, the names of the installers assigned to the job, specific installation details, and the vehicle to be used to drive to and from the job site. These emails, however, did not specify a division of work between the installers; rather, the installers worked jointly on the project.  At least one time, on March 26, 2015, an email related that Guerra, who was the more experienced installer, would take the lead.  Sometimes, Guerra began an installation project but a different installer assigned by Teixeira finished it.  On rare occasions, Teixeira, who had previously worked as an installer before starting his business, worked on a job with Guerra.

Beyond the email sent for each job, Teixeira provided additional instructions and guidance to Guerra and other installers based on the particular job, such as safety requirements or noise restrictions conveyed by the drapery manufacturer or worksite.  Teixeira set deadlines for the completion of projects.  Teixeira also checked in with Guerra by phone during the work day.  He called Guerra to collect information about specific aspects of the job Guerra was working on, which he then conveyed to the site managers upon request.  After completing an installation job,

Guerra was required to send a job report to Teixeira summarizing the work that was completed, along with cell phone photos of the finished product. Teixeira passed the photos along to the manufacturers, who requested proof that the work had been completed. Teixeira also engaged in quality control. For example, on one occasion, a Twicegood Installers Coordinator, Natalia Terencio, instructed Guerra to move a bracket that needed to be only a finger's width away from the valance and to use additional screws.

Whenever Guerra was working, he was required to wear a Twicegood shirt and carry a Twicegood identification card. He carried his own screwdriver and pliers, but drills, batteries, chargers, and more advanced or specialized tools or equipment needed for particular jobs, such as ladders and lifts, were provided by Teixeira, with an equipment charge billed either to Guerra or to the drapery manufacturer. Teixeira also provided Guerra with an installer's apron. The hardware for the drapery—such as screws and slide bars—were provided by the drapery manufacturer to Teixeira, who then passed them along to installers like Guerra.

Teixeira required Guerra and all his installers to use a smartphone application called Timestation to scan in and out each day when they began a job and when they finished a job. Guerra understood these scans to be used to calculate his hourly pay, and indeed the hours recorded by Guerra in Timestation closely match the hours for which Guerra was paid. Guerra sometimes scanned in and out when he took a lunch break during the day, but he often forgot to do so. As required by Teixeira, if Guerra did not have cell phone service at the time that he left the job site, which prevented him from using the Timestation app, or if he forgot to scan out until later in the evening, Guerra called Teixeira and reported the time that he completed the job. Teixeira then manually adjusted Guerra's scan-out time in the Timestation software.

4

While working for Teixeira, Guerra frequently used Twicegood vehicles to travel to worksites and to transport the necessary work materials, but he sometimes used his own vehicle, particularly when the company vehicle was too full of work materials to accommodate passengers. Guerra traveled all over the mid-Atlantic region installing drapery and blinds for Twicegood, including to places such as Pittsburgh, Pennsylvania and Williamsburg, Virginia. When Guerra traveled outside the Washington, D.C. area, Twicegood reimbursed him for the cost of his meals and paid for him to stay in a local hotel, chosen by Teixeira. In turn, Teixeira received reimbursement from the drapery manufacturer whose product was being installed.

Throughout their four-year working relationship, Guerra never declined work offered by Teixeira unless he was sick, and he never took any other jobs performing drapery installation. He did go to 7-Eleven to try to get hired as a day laborer during time periods when Teixeira did not need him for installation work. The only example provided at trial was a brief period when Guerra performed work cleaning up a construction site at a Baltimore school and contacted others he knew through Twicegood to see if they wanted to help. Guerra never hired anyone to assist him with his drapery installation work for Teixeira; rather, on occasion, when Teixeira told Guerra that he needed more installers, Guerra referred friends to Teixeira, who would sometimes hire them.

## II. Pay

At first, Teixeira paid Guerra by depositing his pay in Guerra's Wells Fargo bank account on the first and sixteenth day of each month. At Teixeira's request, Guerra opened a Citibank account so that Teixeira could more easily set up direct deposit from the company's account and Guerra's paychecks would clear more quickly. Teixeira did not provide pay statements to Guerra; rather, he sent Guerra a photograph of the deposit slip each time he made a deposit in Guerra's bank account. Sometimes, when new installers first came on board and did not have bank accounts

yet, Teixeira asked Guerra to allow their money to be sent to his bank account, and Guerra then withdrew the money and gave it to those workers. Guerra's termination letter instructed him to close the Citibank account once his relationship with Twicegood ended.

After Guerra had worked for Teixeira for about five months, at Guerra's request, Teixeira increased his pay from $12 to $13 per hour. Teixeira increased Guerra's pay rate again on four or five occasions by 50 cents each time, until he finally raised the rate by a full dollar to $16.50 per hour, the hourly rate reflected on Guerra's final paycheck.

During the time that Guerra worked for Teixeira, he regularly worked more than 40 hours per week but was never paid overtime. The only additions to his standard hourly pay, according to the Twicegood pay ledger, were reimbursements for travel and accommodations, such as when Guerra used his own vehicle instead of a Twicegood vehicle or when he had to stay overnight at a hotel near a job site. Teixeira also made certain deductions from Guerra's pay, including rental fees for tools, fees for using Twicegood vehicles, and fees for worker's compensation insurance that Teixeira provided for his installers who did not carry their own insurance.

### III. Agreements

On March 26, 2012, Guerra signed a multi-part document entitled "Independent Contractor Agreement—Installer" (the "Contractor Agreement") with a listed effective date of July 21, 2011. The Contractor Agreement stated, among other provisions, that Guerra worked for Twicegood as an independent contractor, that he would be paid by the project, that he could employ others to assist him, that he was responsible for his own taxes, and that he was required to maintain worker's compensation insurance but that it could be obtained through Twicegood via pay deductions. Guerra, who moved to the United States from Guatemala in 2006 and spoke almost no English in 2012, could not read or understand the document. Teixeira did not explain or translate the

6

document. He simply told Guerra that it was a work contract and that he should sign it. Guerra did not understand that the agreement attempted to classify him as an independent contractor.

On March 29, 2012, Guerra signed another document entitled "Twicegood Drapery Experts – Vehicle Sharing Agreement" (the "Vehicle Agreement"), which provided that, for a fee, Guerra could use company vehicles to go to job sites. The fees were deducted from Guerra's paychecks, and the rules of the Vehicle Agreement required Guerra to swipe his Twicegood identification card each time he used a Twicegood vehicle. The Vehicle Agreement also provided that Guerra would receive a "fuel card" to pay for gas in Twicegood vehicles and that Twicegood would reimburse Guerra for expenses related to Twicegood vehicles including "(a) minor (under \$50) routine maintenance on Twicegood vehicles, such as new wiper blades, light bulbs, or windshield-washer fluid, (b) the cost of fuel when the fuel card is missing or not functioning and (c) any other expense that is authorized in advance by . . . Marco Teixeira." Trial. Ex. 2 at 9. These were the only written agreements governing the professional relationship between Guerra and Teixeira, which continued until Guerra was terminated on September 14, 2015.

## IV.    Tax Returns and Self-Employment

Teixeira issued 1099s, reflecting payments to an independent contractor, to Guerra for the years 2011 through 2015. During those years, Guerra filed a federal income tax return only for tax year 2012. Guerra's tax return was prepared by an independent accountant named Jose Machado, who had been recommended to Guerra by Teixeira or Teixeira's secretary. Although Guerra provided his 1099 to Machado, he did not provide any documentation or receipts relating to business expenses to Machado. Machado prepared the tax return, which stated that Guerra was self-employed and reported business expenses relating to advertising, car and truck expenses, repairs and maintenance, utilities, supplies, insurance, and taxes and licenses. Guerra did not

understand the representations made in his tax return; he simply signed it as instructed by Machado before it was filed with the IRS.

In 2017, after he was terminated by Teixeira, Guerra registered a business known as LG Drapery Installations, LLC ("LG"). He posted on his Facebook account photographs of drapery installation work he had performed for Teixeira and represented that LG had been in business since 2010. This claim was false. Teixeira had posted the pictures while he worked for Twicegood with notations that he worked for that company, but when he was terminated he changed the Facebook entry to reference LG in order to create the impression that he had a work history in drapery installation separate from Twicegood. In fact, Guerra did not operate LG during the time that he worked for Twicegood. All written agreements and communications relating to Guerra's work for Twicegood were with Guerra personally, not with LG or any other business entity.

## V.     Credibility Determinations

In making the above findings of fact, the Court was at times required to choose between conflicting testimony and make determinations about witness credibility. Although the Court credits most of the witness testimony, including that of the parties, both Guerra and Teixeira gave the Court reason to question their credibility on certain points. Having observed the testimony, the Court finds that Guerra generally testified credibly regarding his work for Twicegood, the circumstances of his pay, and the fact that he was not operating his own business while working for Teixeira. However, this testimony necessarily raised questions about the truthfulness of the representations made in Guerra's 2012 tax return, in which he reported certain expenses associated with self-employment. The Court therefore rejects Guerra's testimony that the tax return was accurate, but it credits his testimony regarding the circumstances of the preparation of his tax return

and his lack of understanding of precisely how it was prepared. The Court concludes that Guerra did not understand the nature or significance of the tax return.

As for Teixeira, the Court rejects testimony that cannot be squared with the documentary evidence. For example, and as discussed in more detail below, the Court does not credit Teixeira's claim that Guerra and other installers were paid by the job, where documentary evidence establishes that they were paid by the hour. The Court also rejects the testimony that the Timestation tracking system was not used to track the hours worked by Guerra and other installers for payroll purposes, as such testimony is again contradicted by the alignment of the tracking system records to the amounts paid. The Court also does not credit Teixeira's testimony that projects involving multiple installers were divided up as separate subcontracts in telephone calls the night before the work was to be performer. Such testimony is inconsistent with the emails relating to those projects, which describe no such division of work, and it is not reasonable to conclude that such division would have occurred only orally, without any documentation in the written record of the project.

## CONCLUSIONS OF LAW

The four claims advanced by Guerra at trial are for: (1) unpaid overtime under the FLSA; (2) unpaid overtime under the MWHL; (3) unpaid wages under the MWPCL; and (4) associated damages under the MWFA. Based on the foregoing findings of fact, the Court makes the following conclusions of law regarding liability and damages under the FLSA, the MWFA, the MWPCL, and the MWFA.

## I. Worker Classification

All of Guerra's claims turn on whether Teixeira properly classified Guerra as an independent contractor rather than an employee. The parties agree on the applicable tests to

9

distinguish independent contractors from employees under these statutes, but they dispute the application of these tests to the facts adduced at trial.

## A.    FLSA, MWHL, and MWPCL

The FLSA and MWHL both require that covered employees receive overtime pay of one and one-half times their regular pay rate. *See* 29 U.S.C. § 207(a); Md. Code Ann., Lab. & Empl. § 3-415(a); *Veney v. John W. Clarke, Inc.*, 28 F. Supp. 3d 435, 441 (D. Md. 2014). Neither statute, however, extends these overtime protections to independent contractors. *See Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006); s*ee also Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 456 (D. Md. 2000) (applying the same standard under the FLSA and MWHL to distinguish between protected employees and unprotected independent contractors).

A violation of the MWPCL occurs when an employer fails to pay "all wages due for work that the employee performed before the termination of employment," including overtime pay. Md. Code Ann., Lab. & Empl. § 3–505(a); *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625– 26 (Md. 2014) ("[B]oth the [M]WHL and the [M]WPCL are vehicles for recovering overtime wages."); *Campusano v. Lusitano Constr. L.L.C.*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012) (finding the same test for employee status applicable to the FLSA and MWHL applies to claims under the MWPCL). Therefore, in order to receive the overtime protections of the FLSA and MWHL, and to have a claim for back pay through the MWPCL, Guerra must have been an employee, not an independent contractor, within the meaning of the FLSA.

In *McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235 (4th Cir. 2016), the United States Court of Appeals for the Fourth Circuit held that whether a worker is an employee or an independent contractor under the FLSA is determined by the "economic realities of the

10

relationship between the worker and the putative employer." *Id.* at 241 (quoting *Schultz*, 466 F.3d at 304). When applying this economic realities test, courts analyze six factors:

(1) the degree of control that the putative employer has over the manner in which the work is performed;
(2) the worker's opportunities for profit or loss dependent on his managerial skill;
(3) the worker's investment in equipment or material, or his employment of other workers;
(4) the degree of skill required for the work;
(5) the permanence of the working relationship; and
(6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 241. While "[n]o single factor is dispositive," the "touchstone of the 'economic realities' test is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" *Id.* (quoting *Schultz*, 466 F.3d at 304).

Hence, the lived reality of the worker is paramount and supersedes any categorization that a business may have made of its workers, even when the parties have signed a putative independent contractor agreement and the business routinely issues 1099s, rather than W-2s. *See id.* at 239, 241 (holding that exotic dancers were employees even though they had signed a contract that labeled them as "independent contractors"); *Randolph v. PowerComm Constr., Inc.*, 7 F. Supp. 3d 561, 569 n.5 (D. Md. 2014) (noting that "the manner in which Plaintiffs were classified for tax purposes" is not "dispositive in determining their status as employees"). Accordingly, the Court will address each of the six factors in turn, based upon the evidence presented at trial that sheds light on the economic reality of the working relationship between Guerra and Teixeira.

### 1. Control

The evidence established that Teixeira had significant control over the manner in which Guerra performed his work. First, Teixeira controlled the timing of Guerra's work, as evidenced

by the fact that Guerra was required to clock in and clock out using the Timestation app on his cell phone so that Teixeira could track his time and whereabouts. *See Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1314 (11th Cir. 2013) (finding control in part because the putative employer required cable installers to log in and out of a service on their cell phones to record when they arrived on a job and when they completed a job); *Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F. Supp. 2d 667, 674 (D. Md. 2000) (stating that "close monitoring of progress and location indicates a certain degree of control over the Installers"), *aff'd sub nom. Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001). Teixeira testified that Timestation was used not to track installers' hours and attendance on the job site, but to track their use of his rental vehicles and to record installers' whereabouts for liability purposes so that if some misconduct were discovered at a hotel job site, he could potentially use the Timestation records to demonstrate that his installers were not on-site at the time. Although liability may have been one reason to use Timestation, it was not the only reason. Particularly where Teixeira did not consider his installers to be employees, it does not make sense that he would go to such great lengths to track their comings and goings, including by frequently making manual adjustments to the time entries, for that reason alone. As discussed above, the Court finds that, where the Timestation records so closely match the hours for which Guerra was paid according to Teixeira's pay ledger, the primary purpose of the Timestation clock-in and clock-out requirement was to track Guerra's time for his hourly pay. In any event, regardless of its specific purpose, but particularly because of its link to pay, Teixeira's requirement that his installers use Timestation to clock-in and clock-out each day weighs in favor of an employment relationship. *See McFeeley*, 825 F.3d at 242 (finding that a sign-in requirement weighed in favor of a finding of control over the putative employee without addressing the specific reason for the sign-in requirement).

As in *McFeeley*, Teixeira also imposed a number of guidelines on his installers, including requiring them to wear Twicegood shirts and comply with a dress code, carry Twicegood identification cards, and "uphold the values, ethics, attitude and appearance of tenured Twicegood Drapery Experts' employees." Contractor Agreement at 7, Trial Ex. 1. The unilaterally-imposed requirements of certain conduct and appearance requirements weigh in favor of control. *See McFeeley*, 825 F.3d at 242 (considering guidelines on dancers' conduct at the club and the shoes they had to wear as indicia of control). Although Teixeira has correctly noted that in *Herman*, the district court rejected a uniform and identification card requirement as probative on the issue of control over cable installers, it did so in large part because there was a county regulation requiring those items. *See Herman*, 164 F. Supp. at 673. The Fourth Circuit, in its unpublished affirmance, did not address whether such requirements are relevant on the issue of control. *See Chao v. Mid-Atlantic Installation Services Inc.*, 16 F. App'x 104, 106 (4th Cir. 2001). Here, where there was no legal requirement that drapery installers wear uniforms or carry identification cards, and the purported purpose of the requirement, to assure job site personnel that the installers were authorized to be on the premises, could be accomplished through other means, the Court finds that these additional requirements weigh, at least to a limited degree, in favor of a finding of control.

Most importantly, Teixeira provided specific guidance to Guerra and other installers on how to complete the work. In the email sent to Guerra and other installers assigning the work, Teixeira specifically assigned Guerra to work with other installers, sometimes designated a lead installer, provided instructions on the work to be done, and assigned a particular vehicle or vehicles to be used to transport personnel and materials to the job site. Teixeira set deadlines for the completion of each job. Although Teixeira was not usually on site and did not specifically dictate the specific sequence in which the work was done, Teixeira instructed installers about safety

requirements at certain job sites, engaged in communication with Guerra during the work day, and required photographic proof that the work was completed. Teixeira, either personally or through Twicegood personnel, passed judgment on the work and directed changes, such as one instance when Twicegood required Guerra to move a bracket that needed to be only a single finger's width from a valance and directed that he use additional screws to secure it. Thus, unlike in *Hardison v. Healthcare Training Solutions., LLC*, No. PWG-15-3287, 2017 WL 2276840 at *3 (D. Md. May 25, 2017), cited by Teixeira, where a teacher was given a curriculum and lesson plan but was not required to follow it strictly and was never supervised or observed in her work, Teixeira closely monitored Guerra's work.

Although Teixeira argues that any control exerted over the conduct of the work was simply a means to ensure that the drapery manufacturers' contract requirements were met, the fact that the manufacturers may have sought to exercise their own control by having Teixeira enforce their requirements does not explain away Teixeira's exercise of control. *See Scantland*, 721 F.3d at 1316 ("Business needs cannot immunize employers from the FLSA's requirements. If the nature of a business requires a company to exert control over workers to the extent that [the defendant] has allegedly done, then that company must hire employees, not independent contractors."). "[T]he issue is not the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of *another employer*. Rather, it is the degree of control that the alleged employer has in comparison to the control exerted by the *worker*." *Schultz*, 466 F.3d at 305.

Here, Teixeira closely monitored and at times directed the work conducted by Guerra, including by setting deadlines for his work, requiring Guerra to clock-in and out of each job, checking in with Guerra over the phone, requiring that Guerra provide photographs of his work

for Teixeira's approval, and directing changes as needed. Indeed, as a practical matter, Guerra could not perform his job without the close assistance and oversight of Teixeira because the instructions provided by the manufacturers and job sites were in a language Guerra did not speak or understand well and thus had to be translated by Teixeira. *See Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 578 (D. Md. 2008) (finding control where the putative employer translated instructions into Spanish for his painters). Under these circumstances, it would be nearly impossible for Guerra to perform his installation work as an independent economic entity. *See Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312-13 (5th Cir. 1976) (holding that a worker's "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity"). The Court therefore finds that the control factor weighs in favor of employee status.

### 2. Opportunities for Profit or Loss

The second factor under the economic realities test is the worker's opportunities for profit or loss based on managerial skill. *McFeeley*, 825 F.3d at 241. This factor also weighs in favor of a finding of employment status primarily because Guerra was paid on an hourly basis. Although Teixeira testified that Guerra was paid by the project, not by the hour, the documents submitted into evidence prove otherwise. Trial Exhibit 11, a printout provided to Guerra with his last paycheck, reflects the remuneration covered by that final paycheck and expressly notes Guerra's hourly pay rate, which when multiplied by the hours that he worked, yields the amount listed as due to him. Moreover, a side-by-side comparison of the hours Guerra worked, as reflected in the Timestation records, and the amount he was paid, as reflected in the Twicegood pay ledger, yields a near-perfect match. For example, on August 1, 2014, the Timestation records show that Guerra worked 13 hours and 32 minutes, and Teixeira's ledger reflects payment of $189 to Guerra for

labor that day. Trial Ex. 10 at DEF192; Trial Ex. 122 at DEF50. When Guerra's pay is divided by the time worked, it yields a rate of almost exactly $14 per hour, which is consistent with Guerra's testimony of what his hourly rate would have been in mid-2014.

Where a putative employee is paid by the hour, courts have weighed this factor in favor of finding employee status because they cannot increase their profits by working more efficiently. *See Montoya*, 589 F. Supp. at 580 (finding that the painters paid a set salary or hourly rate lacked opportunities for profit based on skill). For example, in *Schultz*, the Fourth Circuit reasoned that security guards who were paid a set amount for a 12-hour shift could not work more efficiently to increase their profits. *Schultz*, 466 F.3d at 308.

Moreover, there is no evidence that Guerra could have increased his profits by taking steps to expand the array of clients. In *McFeeley*, the court concluded that while the exotic dancers took some steps to attract clients by distributing flyers with their photos on them, the primary person responsible for increasing sales was the club owner, who controlled pricing, advertising, and relationships with clients. *McFeeley*, 825 F.3d at 243. Here, Guerra had no means by which to expand the range of clients because he was completely dependent on Teixeira's relationships with drapery manufacturers and ability to contract for installation projects.

Finally, although the Contractor Agreement provided that Guerra could take other drapery installation jobs from other sources and thus increase his opportunity for profit, that right was illusory. Guerra's work schedule for Teixeira left him with little opportunity to take other jobs: he traveled all over the mid-Atlantic region performing installations for Teixeira, and he regularly worked over 40 hours a week, sometimes as many as 80 hours a week. For example, the Timestation records show that Guerra worked for Teixeira every single week in the year 2013. Moreover, Guerra testified that he never turned down an assignment unless he was sick, and

16

Teixeira could only identify one instance over nearly four years when Guerra took other, unrelated work—obtained by standing outside a 7-Eleven—because Teixeira did not have any installation jobs for him. So as a practical matter, Guerra had no freedom to take other drapery installation work while he worked for Teixeira. *See Scantland*, 721 F.3d at 1314 (finding that where the schedule imposed upon cable installers made it nearly impossible to do similar work for other companies, that fact supported employee status). The second factor thus clearly weighs in favor of employee status.

### 3.     Investment in Equipment and Employment of Others

Guerra's investment in equipment and employment of others also weighs in favor of a finding of an employment relationship. As with Guerra's right to enter into contracts with other companies, Guerra's right under the Contractor Agreement to hire other installers to assist him with his work was illusory. Like the cable company in *Scantland*, Teixeira assigned his own installers to every job. *See Scantland*, 721 F.3d at 1314 (stating that "Plaintiffs could, according to their contract, employ others to help them, but any such 'employees' had to be technicians already engaged by [the company]"). As the emails issuing job assignments reveal, Teixeira chose the number of installers based on the scope of the job, specifically selected the individuals to perform the job, and sometimes designated a lead installer. As such, not only was there no need for additional installers on any job beyond those assigned by Teixeira, but there was no practical way to integrate such an employee into the project. Notably, if Guerra had hired additional installers without informing Teixeira, those installers might not have been allowed on the job sites without the Twicegood shirts and identification cards supplied by Teixeira and purportedly required to comply with work site requirements. As a result of Teixeira's control over the installer assignment process, Guerra practically could not, and did not, hire any employees to assist him

with installations for Teixeira.  To the extent that Teixeira has suggested that Guerra once hired a neighbor to work with him, Guerra testified at trial that he merely referred his neighbor, who was looking for work, to Teixeira—a point which Teixeira himself did not contest.  *See Montoya*, 589 F. Supp. at 580 (finding that where painters referred other workers to a putative employer, they did not actually make personnel decisions themselves).

Guerra's investment in equipment was also minimal.  Both he and Teixeira testified that he owned only the most basic tools, such as a screwdriver and pliers.  All the more advanced tools, such as drills, batteries, chargers, specialty tools, ladders, and lifts, as well as in many cases the vehicle used to transport equipment and personnel to job sites, were supplied by Teixeira.  Teixeira argues that these supplies were effectively owned by Guerra because he charged Guerra a fee to use them.  Such fees do not transform this factor into one favorable to Teixeira, because in renting almost all of the needed tools and equipment from Teixeira, Guerra remained economically dependent on Teixeira in that he could not go out and work on installation projects for other clients, as Teixeira only authorized the use of these tools for his own company's business.  *See Scantland*, 721 F.3d at 1318 (concluding that the fact that cable installers purchased specialty tools from their putative employer via payroll withholdings was comparable to having an employee's wages adjusted in order to pay for tools and equipment and "detract little from the worker's economic dependence" on the putative employer).  Since Guerra made little or no investment in equipment or his own personnel, this factor weighs in favor of employment status.

### 4. Skill

Both Teixeira and Guerra testified that drapery installation requires very little specialized skill.  Teixeira specifically acknowledged:  "Drapery installation is [a] really simple trade.  We just need the screwdriver and a few screws to provide the service and any carpenter or handy man

will be able to do the work." 12/10/18 Trial Tr. at 28. Guerra received all of his training on-the-job from Goncalves, another one of Teixeira's installers, and has not needed to engage in study or specialized training or obtain any licenses or certifications. The work is therefore comparable in skill to unskilled painting work at issue in *Montoya*. *See* 589 F. Supp. 2d at 581. Teixeira's own testimony establishes that it requires significantly less than the "skilled trade" of cable installation and repair service that requires "special tools and knowledge" comparable to that of an electrician. *See Chao*, 16 F. App'x at 107; *Herman*, 164 F. Supp. 2d at 670, 675. Based on this testimony, the unpublished cases concluding that certain installation work is high-skilled are distinguishable. *See Zamora v. Washington Home Services, LLC*, No. 11-CV-00831 AW, 2011 WL 6297941 at *3 (D. Md. Dec. 15, 2011) (finding, with almost no analysis, that appliance installation requires significant skill); *Rezendes v. Domenick's Blinds & Decor, Inc.*, No. 8:14-CV-1401-T-33TBM, 2015 WL 3484835 at *13 (M.D. Fla. June 2, 2015) (stating *in dicta* that Rezendes "arguably possessed a specialized skill as an installer" of window treatments, but then noting that he spent 95% of his time engaged in unskilled tasks). Indeed, in *Hardison v. Healthcare Training Solutions, LLC*, 2017 WL 2276840 at *4, cited by Teixeira, the court found that the skills factor weighed in favor of employment status where a nursing instructor had a bachelor's degree and certification as a registered nurse, but she "had no teaching experience when she began working for Defendants, who trained her initially." *Id.* Based on Teixeira's testimony that drapery installation is unskilled work, this factor weighs in favor of a finding that Guerra was an employee.

### 5. Permanence of the Relationship

"The more permanent the relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 309. Here, Guerra's working relationship with Teixeira was enduring and consistent. Guerra worked for Teixeira from 2011 to 2015, and records reveal that he worked

nearly every single weekday—and some weekends—from December 2012 until September 2015, regularly accruing well over 40 hours in a workweek. *See Montoya*, 589 F. Supp. at 581 (finding this factor weighed in favor of employee status where painters worked similar hours and durations to Guerra). As discussed above, to the extent that Guerra engaged in limited other work during this time period, it was not as part of a drapery installation business but instead consisted of sporadic day labor secured by standing outside a 7-Eleven. Although Teixeira argues that Guerra was free to walk away from the relationship at any time, during most of the relevant time period, Guerra lacked the tools and equipment or business and language skills to work on his own. Accordingly, Guerra's right to walk away from the relationship with Teixeira does not undermine the permanence and duration of Guerra and Teixeira's employment relationship.

### 6. Integral Part of the Business

This factor plainly weighs in favor of employment status. Drapery installation work constituted the entirety of Teixeira's business. Teixeira operated Twicegood to install drapery in hotels and other commercial buildings. Guerra conducted such installations. Without the services of Guerra and other installers, Teixeira's business would have no function or purpose.

### 7. Weighing of the Factors

In light of the foregoing analysis, the Court finds that Guerra was Teixeira's employee for purposes of the FLSA, MWHL, and MWPCL. Although no single factor is dispositive, here all six factors weigh in favor of a finding of employee status. The presence of the Contractor Agreement is not dispositive. *See McFeeley*, 825 F.3d at 239, 241 (holding that exotic dancers were employees even though they had signed a contract that labeled them "independent contractors"). Rather, as in *McFeeley*, the ability of Teixeira to control the performance of the work through tracking time, imposing guidelines, and monitoring the work of the installers, the

20

lack of managerial skill and investment by Guerra, the low-skilled nature of the work, and the importance of drapery installation to Teixeira's business compel this conclusion. *See id.* at 242-44. Although Teixeira argues that Guerra's role was comparable to that of a cable installer in *Chao*, that working relationship was different in several significant ways, including that those workers were free to complete their routes in whatever order they wished, did not have their time and whereabouts tracked meticulously, and did not have their work routinely monitored and reviewed, whether in person or through photographs; they did not have other personnel assigned to work with them; they had invested in their own work vans with all of the tools and equipment needed to install and repair cable systems; and they required skills comparable to that of an electrician. *Chao*, 16 F. App'x at 106-07. Guerra's role was more akin to that of the cable installers in *Scantland*, who were required to log in and out and were subject to site checks of their work, 721 F.3d at 1314, and the painters in *Montoya*, who engaged in low-skill work learned through on-the-job training, were paid based on their time rather than the job, and owned only the most basic tools of the trade and relied on the company for necessary equipment, 589 F. Supp. 2d at 578-81. The Court therefore finds that Guerra was an employee, not an independent contractor.

Teixeira's reference to Guerra's 2012 tax return and Facebook postings do not alter this conclusion. In 2012, while working for Teixeira, Guerra filed a federal income tax return on which he listed himself as "self-employed" in "drapery services." Trial Ex. 150 at 49-50. On the Schedule C attached to his IRS Form 1040, he listed business expenses including advertising, car and truck expenses, repairs and maintenance, supplies, utilities, and uniforms and laundry, insurance, and taxes and licenses. Teixeira also introduced screenshots of Guerra's Facebook page that refer to his alleged business, LG, and specifically state that he started working for LG in 2010 and include photos of his alleged work for LG during 2014 and 2015.

Although these documents arguably support the conclusion that Guerra was operating his own drapery installation business, the fact that Guerra signed a tax return stating that he was self-employed is neither dispositive nor surprising, given that Teixeira gave him a 1099, which signaled to any accountant that he was self-employed. Notably, even if Guerra subjectively believed, based on the fact that he was given a 1099, that he should be treated as an independent contractor for tax purposes, that belief would not control the question of his status for purposes of the FLSA. The economic realities of the working relationship supersede the worker's subjective intent or understanding of his relationship with the putative employer. *See Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 300-02 (1985) (finding that although certain workers claimed to be volunteers, as opposed to employees, such views were not dispositive); *Montoya*, 589 F. Supp. at 577-78 (finding that workers' preference not to be classified as employees because of their undocumented status did not control, because "neither the subjective intent of the worker in forming the employment relationship nor the label affixed by the putative employer controls the question whether a worker is an employee under the FLSA"); *see also McFeeley*, 825 F.3d at 239, 241 (finding that workers were employees even though they had been signed an agreement classifying them as independent contractors).

Moreover, the Court credits Guerra's testimony that there was no such business, that he did not provide any records showing the listed expense figures to Machado, the accountant, and that he did not understand the tax return: Machado simply prepared it for him, and Guerra signed it. Where Machado, who did not specifically recognize or recall Guerra, acknowledged that he sometimes prepares tax returns based on an oral discussion about expenses with a client who brings a 1099 but does not have receipts or documentation, it is plausible that Machado arrived at expense figures based on such a discussion with Guerra, in which Guerra misconstrued questions about his

expenses as relating to costs incurred on behalf of Twicegood or his own personal expenses. In particular, the Court concludes that the listed figures do not represent actual expenses for a business operated by Guerra because there was no evidence suggesting that Guerra had ever incurred business expenses, whether on behalf of Twicegood or as part of his own business, for several of the listed categories, including advertising, utilities, taxes and licenses, and repairs and maintenance apart from car and truck expenses.

For similar reasons, the Court does not rely on evidence from Guerra's Facebook page as establishing that Guerra had his own drapery installation business as early as 2010. The Court credits Guerra's testimony that he had originally noted that the photos of his installation projects were from his work for Twicegood, that after he stopped working for Twicegood he changed his Facebook page to state that he worked for LG, and that the claim that he had worked for LG since 2010 was inaccurate because he needed to show a work history. It does so because it is undisputed that Guerra did not register LG as a business until 2017, and if Guerra had truly operated his own business while working for Twicegood, LG would have been referenced in the Contractor Agreement, he would not have used a Twicegood email address in corresponding with Teixeira about work, and there would be some other evidence of LG's existence before 2017. There is none.

In the end, the core question of "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself," *McFeeley*, 825 F.3d at 241, must be resolved by finding that Guerra was almost entirely dependent on Twicegood for his livelihood and was not himself in the drapery installation business. Guerra depended on Teixeira for his instructions, tools, uniform, identification, email address, and all communications with the drapery manufacturers whose curtains he installed.

Guerra could not have feasibly operated, and did not operate, his own independent drapery installation business. The Court therefore concludes that Guerra was an employee, not an independent contractor.

**B.    MWFA**

The MWFA uses a slightly different test to determine whether an employer-employee relationship exists. Although neither the parties nor the Court have identified any case law interpreting the MWFA, the Court may discern its meaning from the plain language of the statute. The MWFA reads, in relevant part:

> Work performed by an individual for remuneration paid by an employer shall be presumed to create an employer-employee relationship, unless . . . an employer demonstrates that:
>
> (1) the individual who performs the work is free from control and direction over its performance both in fact and under the contract;
> (2) the individual customarily is engaged in an independent business or occupation of the same nature as that involved in the work; and
> (3) the work is: (A) outside of the course of business of the person for whom the work is performed; or (B) performed outside of any place of business of the person for whom the work is performed.

Md. Code Ann., Lab. & Empl. § 3–903(c)(1). The MWFA thus places the burden on the employer to show that the worker should not be classified as an employee. The inquiry under the MWFA test is not a flexible balancing test like the economic realities test; rather, it requires a putative employer to prove all three factors in order to establish the lack of an employment relationship. If any factor is not proven, the Court must apply the presumption in favor of an employer-employee relationship.

As to the first factor, as discussed extensively in the Court's analysis under the FLSA, MWHL, and MWPCL, *see supra* part I.A.1, although Guerra's contract suggested that he was free from Teixeira's control and direction, the factual reality of his relationship with Teixeira was that

24

Teixeira had significant control over the manner and means by which Guerra performed his work. Under the second factor, the Court has found that Guerra was not engaged in an independent drapery installation business. Because Teixeira has failed to meet his burden to establish the first and second requirements, the Court need not reach the third requirement. The Court finds that Guerra is an employee for purposes of the MWFA.

## II. Liability

### A. FLSA, MWHL, and MWPCL

Although an employment relationship is required for a finding of liability under the FLSA, MWHL, MWPCL, and MWFA, each statute requires more. The FLSA, MWHL, and MWPCL also require a showing that the plaintiff did not receive overtime pay to which he was otherwise entitled. 29 U.S.C. § 207(a)(1) (FLSA); Md. Code Ann., Lab. & Empl. § 3–415 (MWHL) and § 3-505(a) (MWPCL); *Peters*, 97 A.3d at 625-26 (providing that unpaid overtime is recoverable under the MWPCL); *see also Campusano*, 56 A.3d at 308 (applying FLSA and MWHL standards to an MWPCL claim); *Turner v. Human Genome Scis., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003) (holding that "[t]he requirements under the MWHL mirror those of the [FLSA]; as such, [a plaintiff's] claim under the MWHL stands or falls on the success of [the] claim under the FLSA"). A violation of the MWPCL also can be established where an employer makes a deduction from the wage of employee that is not "authorized expressly in writing by the employee." Md. Code Ann., Lab. & Empl. § 3–415.

Under the FLSA, the employer must also be covered under the statute. 29 U.S.C. §§ 203(s)(1), 207(a)(1). This can be established by a showing of individual coverage or enterprise coverage. *See Ergashov v. Glob. Dynamic Transportation, LLC*, 680 F. App'x 161, 162 (4th Cir. 2017). Individual coverage is established when the plaintiff is "engaged in commerce or the

production of goods for commerce," and enterprise coverage requires that the defendant employer is "an enterprise engaged in commerce or the production of goods for commerce" that had annual gross sales of at least $500,000. 29 U.S.C. §§ 203(s)(1), 207(a)(1). In this case, Teixeira concedes enterprise coverage.

To establish the element of unpaid overtime under all three statutes, the plaintiff must show that the defendant failed to pay the plaintiff overtime for all hours worked in excess of 40 in one or more workweeks. 29 U.S.C. § 207(a)(1). Both the federal and state statutes place the burden to maintain employment records, including the tally of hours worked and wages paid, upon the employer rather than the employee. 29 U.S.C. § 211(c) ("Every employer . . . shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him[.]"); Md. Code Ann., Lab. & Empl. § 3–424 ("Each employer shall keep, for at least 3 years, in or about the place of employment, a record of: (1) the name, address, and occupation of each employee; (2) the rate of pay of each employee; (3) the amount that is paid each pay period to each employee; (4) the hours that each employee works each day and workweek[.]"); *see Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) ("[I]t is the employer who has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed.").

An employee "has the burden of establishing the hours he claims to have worked and the work he claims to have performed for which he was not paid." *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 737 (D. Md. 2005). However, if an employer does not keep records or fails to produce them in litigation, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence

to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. "The burden then shifts to the employer" to negate the reasonable inferences drawn from the employee's evidence. *Id.* Because courts may award approximate damages to employees, employees do not have to "prove each hour of overtime work with unerring accuracy or certainty." *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988); *see Anderson*, 328 U.S. at 688.

Here, Guerra has provided the read-outs from Timestation, which recorded every time he swiped in and out of work vehicles and job sites. At trial, Guerra testified that although he occasionally forgot to scan in or out, or was unable to do so because his phone did not have a signal, he consistently used this system throughout the time he worked for Teixeira. Furthermore, Guerra testified that when he failed to scan in or out, he would call Teixeira and orally report the time he started or stopped work, and Teixeira would then manually adjust the Timestation records to reflect the correct amount of time on the job. The Timestation records reflect this practice, and Teixeira also testified that he made corrections to reflect when Guerra was actually at the job site. As discussed above, a comparison of the Timestation records to the Twicegood pay ledgers reveals that the time periods captured by Timestation generally reflect the hours for which Guerra was paid. Accordingly, the Timestation data, combined with the parties' testimony on its use, provide a sufficient basis to support a reasonable inference that Guerra worked the identified hours in the Timestation records. *See Randolph*, 7 F. Supp. 3d at 572-73. Because the tracking data shows that Guerra worked more than 40 hours per week on many occasions, Guerra has proven that Teixeira is liable to him for violations of the FLSA, MWHL, and MWPCL.

**B.      MWFA**

A plaintiff can prove a violation of the MWFA by showing that (1) an individual works in construction services or landscaping services; and (2) the "employer has failed to properly classify an individual when an employer-employee relationship exists . . . but the employer has not classified the individual as an employee." Md. Code Ann., Lab. & Empl. §§ 3–902-03. The MWFA defines work in "construction services" to include building, reconstructing, improving, enlarging, painting, altering, maintaining, and repairing services in connection with real property. *Id.* § 3-901(b). Installing drapery and blinds in hotels and other businesses fits within this definition. As discussed above, an employer-employee relationship existed between Guerra and Teixeira for purposes of the MWFA, but, as both parties agree, Teixeira classified Guerra as an independent contractor, not an employee, including by issuing him 1099s instead of W-2s, utilizing an independent contractor agreement instead of an employment agreement, and failing to pay him overtime. Thus, Guerra has also proven that Teixeira is liable for a violation of the MWFA.

**III.      Statute of Limitations**

Guerra worked for Teixeira from approximately July 2011 until September 14, 2015. He filed this case on December 10, 2015. The FLSA has a two-year statute of limitations, but the limitations period is extended to three years if the defendant's violation is "willful," 29 U.S.C. § 255(a), specifically, if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The MWHL and MWPCL both have a three-year statute of limitations. Md. Code Ann., Cts. & Jud. Proc. § 5-101 (2011). The MWFA also has a three-year statute of limitations: "An action filed under this section shall be filed within 3 years after the date the cause

of action accrues." Md. Code Ann., Lab. & Empl. § 3-911(b). Thus, Teixeira could only be liable for unpaid overtime from on or after December 10, 2012.

Guerra argues that the Court should apply the doctrine of equitable tolling to allow him to recover damages for the entirety of his period of work for Twicegood. Equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case [and] does not lend itself to bright-line rules." *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) (quoting *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999)). "[A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Harris*, 209 F.3d at 330. Generally, equitable tolling is available when (1) "the plaintiffs were prevented from asserting their claims by some kind of wrongful conduct on the part of the defendant," or (2) "extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time." *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (quoting *Harris*, 209 F.3d at 330)). The Fourth Circuit has held that the failure of an employer to comply with the federal regulatory requirement to conspicuously "post and keep posted a notice explaining the [FLSA]," 29 C.F.R. § 516.4, is the kind of wrongful conduct by the defendant that can justify equitably tolling the statute of limitations. *Cruz*, 773 F.3d at 146–47.

At trial, Guerra testified, and Teixeira did not dispute, that Teixeira did not post a notice explaining the FLSA in his home, where Guerra traveled each morning to pick up supplies and equipment before heading to a job site. However, "tolling based on lack of notice continues until the claimant retains an attorney or obtains actual knowledge of [the employee's] rights." *Id.* at 147. At trial, Guerra admitted that while he was employed by Teixeira, he was aware of his right to overtime pay. Later, he backtracked and testified that he suspected that he had a legal right to

overtime pay, but he acknowledged that he had received overtime pay in a prior job. Moreover, Guerra testified that he affirmatively asked for raises and discussed his hourly wage with Teixeira as far back as late 2011, thus demonstrating that he felt empowered to discuss pay with Teixeira. Where the Fourth Circuit has cautioned that the application of equitable tolling should be "guarded and infrequent," and Guerra was either aware that or subjectively believed that he had a right to overtime pay, the Court declines to exercise its discretion to equitably toll the statutes of limitations at issue in this case. *Harris*, 209 F.3d at 330.

Guerra did not present argument that Teixeira's violation was "willful" and therefore merits an extension of the FLSA's limitations period from two years to three years, presumably because he can recover only once for Teixeira's failure to pay overtime under the FLSA, MWHL, MWPCL, and MWFA. *See Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 333, (1980) (stating that it "goes without saying that the courts can and should preclude double recovery by an individual"); *Mould v. NJG Food Serv. Inc.*, No. JKB-13-1305, 2014 WL 1430696 at *2 n.1 (D. Md. Apr. 11, 2014) (stating that "even where a plaintiff sues under … the MWPCL, the MWHL, and the FLSA" the plaintiff "would only be able to recover once for damages resulting from a defendant's failure to pay wages as required by law" even if liability is established under all of these statutes); *Clancy v. Skyline Grill, LLC*, No. ELH-12-1598, 2012 WL 5409733 at *5 (D. Md. Nov. 5, 2012) (holding that the plaintiff could "recover only once for all damages resulting from Defendant's failure to pay him his deserved wages, even though Plaintiff established Defendant's liability under all [the FLSA, the MWHA, and the MWPCL] and for breach of contract") *report and recommendation adopted*, No. ELH-12-1598, 2013 WL 625344 (D. Md. Feb. 19, 2013). Defense counsel, in his closing argument, also acknowledged that willfulness is ultimately not "that compelling or that critical of an issue" because the MWHL, MWPCL, and

MWFA each have three-year statutes of limitations. 12/13/18 Trial Tr. at 60. Accordingly, the Court does not need to determine whether Teixeira's violations were "willful" and merit an extension of the statute of limitations under the FLSA from two to three years. Because the MWHL, MWPCL, and MWFA all have three-year statutes of limitations, the Court will allow Guerra to recover damages dating back to December 10, 2012, three years prior to the date that Guerra filed this action in the Circuit Court for Montgomery County, Maryland.

## IV.   Damages

### A.    Unpaid Overtime

The FLSA, MWHL, and MWPCL all allow plaintiffs to recover unpaid overtime at a rate of 1.5 times the usual hourly wage for each hour worked over 40 hours per week. 29 U.S.C. § 207(a)(1); Md. Code Ann., Lab. & Empl. §§ 3–415, 420; *Peters*, 97 A.3d at 625-26. Accordingly, the Court will order Teixeira to pay Guerra the actual overtime compensation that he was due for every week that he worked more than 40 hours from December 10, 2012 until he left Twicegood on September 14, 2015.

### B.    Deductions and Taxes

Guerra also argues that under the MWPCL or MWFA, he should receive damages for illegal and unauthorized deductions from his pay. The MWFA allows a private plaintiff to recover economic damages arising from a statutory violation. Md. Code Ann., Lab. & Empl. § 3–911(a)(1) (stating that "an individual who has not been properly classified as an employee may bring a civil action for economic damages against the employer for any violation of this subtitle").

Teixeira deducted 4.76 percent of Guerra's compensation for installation work from each of Guerra's paychecks to cover worker's compensation insurance. According to the Contractor Agreement, the 4.76 percent "represents the current Workers Comp premium . . . charged by

[Twicegood's] insurance company." Trial Ex. 1 at 3. Daniel Schaefer, the insurance agent who handles Twicegood's commercial policies, testified that the worker's compensation insurance company "back-charges" a percentage of labor costs for subcontractors engaged by Teixeira who do not carry their own worker's compensation insurance.

While this deduction may have been appropriate had Guerra been an independent contractor, under Maryland law, all employers are required to secure worker's compensation coverage for their employees, and they are prohibited from misclassifying their employees to subvert this requirement. *See* Md. Code Ann., Lab. & Empl. §§ 9–402, 402.1. An "agreement by a covered employee to pay to or for an employer any part of a premium for [worker's compensation] coverage . . . is void." Md. Code Ann., Lab. & Empl. § 9–408(b). Where the Court has found that Guerra was an employee and not an independent contractor, the Twicegood contract provision requiring deductions from Guerra's pay for his worker's compensation insurance premium is void as a matter of law. *See id.* Because these deductions would only be valid if Guerra were properly classified as independent contractor, they constitute the sort of economic damages stemming from misclassification that the MWFA contemplates. Therefore, the Court will award damages for all deductions from Guerra's pay for worker's compensation insurance made between December 10, 2012 and September 14, 2015.

Teixeira also deducted a fee for the use of tools and equipment from each of Guerra's biweekly paychecks. Teixeira did not have a written agreement with Guerra regarding these deductions and testified that, if Guerra wanted to see an itemization of the deductions, he would explain them verbally. Indeed, none of the signed agreements refer to a tools and equipment deduction. Thus, this deduction violates the plain language of the MWPCL, which states, in relevant part, "[a]n employer may not make a deduction from the wage of an employee unless the

deduction is . . . authorized expressly in writing by the employee." Md. Code Ann., Lab. & Empl. § 3–503; *see Marshall v. Safeway, Inc.*, 88 A.3d 735, 745-46 (Md. 2014) (holding that the MWPCL should be read broadly to confer a private cause of action for unauthorized wage garnishments and other deductions under § 3–503). Oral acquiescence to such deductions does not render them lawful. *See Marroquin v. Canales*, 505 F. Supp. 2d 283, 292-93 (D. Md. 2007) (holding that even if plaintiffs orally accepted food and lodging in lieu of overtime pay, there was still a violation of the MWPCL). Accordingly, the Court will award damages for all deductions from Guerra's pay for tools and equipment from December 10, 2012 through September 14, 2015.

Finally, in Guerra's Amended Complaint, he seeks damages under the MWFA for "additional and unnecessary taxes" he was forced to pay due to Guerra's misclassification of him as an independent contractor. Am. Compl. at ¶ 44, ECF No. 11-1. Guerra's trial brief also states that Guerra is due "self-employment taxes," but he provides no explanation of the nature of these taxes, and neither party introduced any evidence of Guerra's tax payments other than his 2012 federal tax return, which states that he paid $137 in federal income taxes. Pl. Trial Br. at 9, ECF No. 77. Moreover, in his closing argument, when Guerra's counsel presented the Court with a proposed method for calculating damages, he made no mention of unfair tax payments as damages. Accordingly, where there was no evidence that Guerra paid higher taxes as a result of Teixeira's misclassification of him under the MWFA, the Court will not award damages for such taxes.

### C. Liquidated Damages

#### 1. Double Damages

The FLSA, MWHL, MWPCL, and MWFA all provide for liquidated damages under certain circumstances. Under the FLSA and the MWHL, double damages are mandatory unless "the employer shows to the satisfaction of the court that the act or omission giving rise to such

33

action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260; *see id.* § 216(b); Md. Code Ann., Lab. & Emp. § 3-427(d)(1); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir. 2011). The employer bears the burden of proof for establishing this defense. *Perez*, 650 F.3d at 375. Both "good faith" and "reasonable grounds" are measured objectively, and only one element must be established to overcome the presumption of double damages. *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015).

On the question whether, under the FLSA and MWHL, Teixeira objectively acted in good faith or with reasonable grounds in not paying overtime, the Court finds that he did not. Under *McFeeley*, this defense requires an affirmative inquiry that results in a reasonable basis to believe that classification as an independent contractor is lawful. There, the defendant club owner asserted that he acted in good faith when he classified exotic dancers as independent contractors because they were so classified when he took over management of the club and he simply maintained that classification. *McFeeley*, 825 F.3d at 245. The court found that the defendant's failure to review the law or seek legal advice until he faced a lawsuit proved fatal to this argument, noting that "[i]f mere assumption amounted to good faith and reasonable belief of compliance, no employer would have any incentive to educate itself and proactively conform to governing labor law." *Id.* However, once the defendant consulted counsel and received legal advice that he could continue to classify the dancers as independent contractors, he had a valid good faith defense to liquidated damages from that point forward. *See id.*

Here, Teixeira testified that he did not consult an attorney or Department of Labor regulations before deciding to treat Guerra as an independent contractor. Rather, having previously worked as an installer for other companies, he explained, "I just treat him like all other

contractors or manufacturers or hotels treat me." 12/10/18 Trial Tr. at 69-70. When asked if he conducted any research to understand the distinction, Teixeira vaguely stated that he consulted a form or booklet from his insurance company describing the difference between employees and contractors. Teixeira did not produce this form or otherwise explain what information within it instructed him that he could treat installers like Guerra as independent contractors. Moreover, there is evidence that Teixeira understood that the classification was improper, such as the fact that, although he calculated Guerra's pay by the hour, he never provided Guerra with a paystub reflecting the hourly calculations until Guerra's final paycheck, when Guerra was required to pick it up in person and a Twicegood representative gave him such a record. Under these circumstances, particularly where Teixeira failed to make the kind of inquiry to counsel or legal materials that occurred in *McFeeley* and could not identify the source he consulted or explain what information it provided, the Court finds that Teixeira has not established good faith or reasonable grounds for classifying Guerra as an independent contractor. Accordingly, Guerra is entitled to mandatory double damages under the FLSA or MWHL.

### 2. Treble Damages

The MWPCL and MWFA both provide for up to treble damages, at the court's discretion. Under the MWPCL, liquidated damages are permitted where "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute." Md. Code Ann., Lab. & Empl. § 3-507.2(b). A bona fide dispute is "a legitimate dispute over the validity of the claim or the amount that is owing where the employer has a good faith basis for refusing an employee's claim for unpaid wages." *Peters*, 97 A.3d at 627. The test for whether a bona fide dispute exists is whether the employer had an "actual, subjective belief" that its position was "objectively and reasonably justified." *See id.* Under the MWFA, a court may

award an amount up to treble damages if the employer "knowingly failed to properly classify the individual." Md. Code Ann., Lab. & Empl. § 3–911(c)(2). The plain language of the statute appears to require a subjective inquiry whether the defendant was actually aware that the classification of an employee as an independent contractor was improper.

In *Peters*, the Court of Appeals of Maryland explained that the treble damages option under the MWPCL was "included in the statute for a remedial purpose—to cure what the Legislature saw as a problem with 'wage theft'" and to provide employers with "a greater incentive . . . to pay employees the amounts owed to them, in full." *Peters*, 97 A.3d at 630 (footnote and citation omitted). The court further noted that the legislature was seeking to address the "practical difficulties that employees have in bringing lawsuits to recover wages owed." *Id.* Rather than identify specific factors to consider or formulas to employ in arriving at a damages figure, *Peters* provided the following guidance: "[W]e simply say that trial courts are encouraged to consider the remedial purpose of the [M]WPCL when deciding whether to award enhanced damages to employees." *Peters*, 97 A. 3d at 630.

Here, Teixeira testified that he subjectively believes that Guerra was properly classified as an independent contractor. Teixeira had some basis to hold this belief. Regardless of whether the unspecified documentation from his insurance company supported that belief, Teixeira testified that when he was an installer working for others, he was classified as an independent contractor. Assuming that he modeled his business after the companies for which he previously worked, it is understandable if not justified that he would adopt a similar arrangement. Moreover, the documentation used by Twicegood, including the Contractor Agreement, the Vehicle Agreement, and the identification card which specifically contains a disclaimer that the installer is not an employee of Twicegood, are sufficiently sophisticated that it is clear that Teixeira did not draft

them himself. Whether he specifically obtained legal advice or simply used model forms he obtained from others, they provide a basis to support a claim that he subjectively believed that with proper structure and documentation, an independent contractor arrangement was permissible.

However, as discussed above, the Court has found that Teixeira's claims that Guerra was paid by the job, and that the Timestation records were maintained only for liability purposes, cannot be credited and are plainly inconsistent with the documentary evidence. *See supra* Findings of Fact part V. Moreover, the fact that Twicegood calculated Guerra's pay by the hour but concealed documentation reflecting that methodology undermines the claim that Teixeira, in fact, subjectively believed that independent contractor status was warranted. Based on this evidence, the Court concludes that Teixeira knowingly misclassified Guerra.

As to the amount of damages to be imposed, the Court finds that double damages are warranted, as they are for the claims under the FLSA and the MWHL, but concludes that treble damages should not be imposed. Where Teixeira was applying a business model that had previously been used to classify him as an independent contractor when he was an installer, this case is distinguishable from the most egregious violations. Although the Court takes seriously the remedial purpose of the wage and hour laws, given the size of Teixeira's business, an award of double damages will likely be more than sufficient to incentivize compliance with overtime requirements, such that an award of treble damages is not necessary to achieve this goal. Under these circumstances, the Court, in its discretion, will order the payment of double but not treble damages to Guerra.

### D.      Damages Calculation

For the reasons stated above, the Court has found that Guerra is entitled to double damages for unpaid overtime and unlawful deductions from his pay under the MWHL, MWPCL, and

MWFA from December 10, 2012 to September 14, 2015. The Court agrees with Guerra that the number of overtime hours can generally be calculated using the Timestation records. Although the Court recognizes that the Timestation records may not precisely reflect the hours worked, whether because Guerra forgot to scan in or out on occasion, or because they do not reflect lunch or other breaks, its review of the records in conjunction with the Twicegood ledgers reveals that for the most part, the hours reflected in the Timestation records correspond to the hours for which Guerra was paid. The Court therefore concludes that where Twicegood did not maintain wage and hour records as required by law, such that "unerring accuracy or certainty" is not required, the Timestation records may properly be used to calculate Guerra's work hours. *Pforr*, 851 F.2d at 108.

However, the Court disagrees with Guerra's position that the Court should use the modified Timestation records for certain dates, as reflected in Trial Exhibit 14, rather than the original Timestation records in Trial Exhibit 10, in calculating unpaid overtime. Although Guerra's counsel argued that the hours reflected in the Timestation records were illegally altered by Teixeira to reflect reduced hours worked by Guerra, Guerra offered no evidence to support that claim. While the records clearly reflect that, on some dates, Teixeira manually altered Guerra's hours after Guerra submitted them, the alterations were made close to the time that the hours were incurred and appear consistent with the trial testimony that Teixeira did, upon notification by Guerra that he forgot to scan in or out or could not do so for technological reasons, make legitimate alterations to more accurately reflect Guerra's actual time on the job site. Thus, the Court concludes that unpaid overtime should primarily be calculated using the Timestation entries in Trial Exhibit 10.

As for the hourly rate of pay, Guerra testified that he was paid $12 per hour when he first started working for Twicegood in July 2011, received a raise to $13 per hour approximately five

months later, and received periodic raises until he was paid $16.50 per hour by the time he stopped

working in August 2015. However, he could not specify exactly when his pay rate changed, and

no records explicitly identify when it changed. Accordingly, as a reasonable estimate, the Court

will apply hourly rates of $13 for 2012; $14 for 2013; $15 for 2014; and $16 for 2015, except for

the work reflected in Trial Exhibit 11, to which the Court will apply the stated hourly rate of

$16.50. *See id.* These figures are generally consistent with the trial testimony of Guerra and with

the Court's determination of the actual hourly rate used for certain entries in each year for which

the Twicegood ledger is available, as calculated by taking the hours worked on a given day as

reflected in the Timestation records and dividing by the actual amount paid for that day as reflected

in the Twicegood ledger.

Because of these determinations, which differ in some ways from those used by Guerra's

counsel, the Court cannot simply adopt the recommended calculations previously submitted.

Accordingly, the Court will direct the parties to jointly submit to the Court a calculation of

damages based upon the following instructions:

1. **Overtime:**

   a. For each week from December 10, 2012 to September 14, 2015, use Trial Exhibit 10 or Trial Exhibit 11, as applicable, to calculate the number of hours worked per week. If the number is greater than 40 hours, calculate the number of hours over 40 worked during that week rounding to the nearest hour. For time periods for which there are no entries in Trial Exhibit 10, such as December 10, 2012 to December 31, 2012, use the average number of overtime hours from the next three weeks for which overtime hours can be calculated.

   b. Multiply the number of overtime hours by 0.5 times the hourly rate applicable for the calendar year or relevant time period, as described above.

2. **Worker's Compensation and Tools and Equipment Charges:**

   a. For each week from December 10, 2012 to September 14, 2015, add up the total amount deducted for worker's compensation insurance and tools and small equipment charges as reflected in Trial Exhibits 16, 122, and 123.

    b. For 2013, for which no ledger is available, include the total of such charges for calendar year 2014.

**3.    Liquidated Damages:**

    a. Add together the amounts calculated in parts 1 and 2, above.

    b. Multiply this total by two.

## CONCLUSION

For the foregoing reasons, the Court finds that Teixeira is liable for violations of the FLSA, MWHL, MWPCL, and MWFA and will award double damages in accordance with the calculation instructions provided. A separate Order shall issue.

Date: January 25, 2019

THEODORE D. CHUANG
United States District Judge